UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
URBAN BOX OFFICE NETWORK, INC.,           :
                                          :
                                          :
                          Plaintiff,      :
                                          :
                                          :
          -against-                       :
                                          : 01 Civ. 8854 (LTS)(THK)
                                          :
INTERFASE MANAGERS, L.P., et al.,         :
                                          :      **MEMORANDUM OPINION**
                                          :         **AND ORDER**
                                          :
                          Defendants.     :
------------------------------------X
**THEODORE H. KATZ, United States Magistrate Judge.**

This breach of contract action was referred to this Court for general pretrial supervision, by the Hon. Laura T. Swain, United States District Judge. Presently before the Court is a dispute among the parties regarding the privileged status of various documents which Plaintiff, Urban Box Office Network, Inc. ("UBO"), withheld from production.

BACKGROUND

UBO brought this action against Defendants Scott Hyten ("Hyten"), Interfase Managers, L.P., and various other limited partnerships with which Hyten and Interfase were associated (collectively "Defendants"), for breach of a stock purchase agreement. The parties have been engaged in pretrial discovery. UBO has asserted the attorney-client privilege and work product doctrine with respect to a relatively limited number of documents and, as required by the rules of this Court, produced to Defendants

a privilege log identifying the documents, the senders and recipients of the documents, and their general subject. (See UBO Privilege Log ("Priv. Log"), attached as Exhibit ("Ex.") 1 to the Letter from Mark T. Mitchell, Esq. to the Court, dated Jan. 19, 2006 ("Mitchell Ltr.").)[1] Defendants contend that Plaintiff has inappropriately claimed privilege because (1) numerous documents on the privilege log involve communications with third-parties who are not attorneys, (2) other documents on the log are communications between two non-lawyers, with an attorney merely copied, (3) many of the documents appear to be business communications rather than legal communications, and (4) Plaintiff has waived any privilege because it produced in discovery other communications between the same parties. (See Mitchell Ltr. passim.)

Plaintiff responds that the non-party recipients and senders of the privileged communications were either UBO board members, or agents who were working directly with UBO with respect to the stock purchase agreement in issue. Plaintiff argues that these agents were providing expert financial advice and information "absolutely necessary for [UBO's attorneys] to provide full and appropriate legal advice to UBO on the terms and details of the deal [with Defendants], and the legal strategy for dealing with defendants

---

[1] Plaintiff's counsel also instructed deposition witnesses to not respond to questions relating to communications with counsel. These communications cover the same general subjects as the written communications on the privilege log.

2

when they unlawfully reneged on their commitments." (Letter from Mariann Meier Wang to the Court, dated Jan. 27, 2006 ("Wang Ltr."), at 2.)  In addition, Plaintiff argues that there has been no waiver of privilege because the communications that were produced to Defendants did not contain legal advice or even commentary by attorneys, and no attorney was involved in or even copied on the communications. (See id. at 4-5.)

After reviewing the privilege log, the Court directed Plaintiff to submit the documents on the log for in camera inspection.  The Court's review of the documents left questions as to whether privilege had been properly invoked with respect to many of the documents.  Accordingly, the Court issued an Order requiring Plaintiff to explain:

> (1) in what capacity and what role counsel was serving with regard to the transaction in issue; (2) why, what appear to be communications about business and financial matters related to the transaction should be viewed as privileged attorney-client communications, particularly when many of the communications emanated from non-employee financial advisors and consultants; and (3) with respect to each document on the privilege log, (a) what was the nature of the legal advice being sought or communicated, and (b) on what basis the Court could conclude that the communication was primarily for the purpose of seeking legal advice.

(Order, dated Feb. 28, 2006.)  In response to the Court's Order, Adam Kidron, the Chief Executive Officer ("CEO") of UBO, submitted a declaration describing the nature of the relationships between the various parties to the privileged communications and a very general explanation of why the communications should be viewed as

facilitating UBO's receipt of legal advice. (<u>See</u> Declaration of Adam Kidron, dated Mar. 7, 2006 ("Kidron Decl.").)

Having now considered all of the submissions of the parties, the Court is in a position to rule on the questions presented.

DISCUSSION

## I.   Law of Attorney-Client Privilege

The general parameters of the attorney-client privilege are well known and have previously been set forth by the Court in this litigation. <u>See</u> <u>Urban Box Office Network, Inc. v. Interfase Managers, L.P.</u>, No. 01 Civ. 8854 (LTS)(THK), 2004 WL 2375819, at *2-3 (S.D.N.Y. Oct. 21, 2005).   The attorney-client privilege affords confidentiality to communications among clients and their attorneys, for the purpose of seeking and rendering an opinion on law or legal services, or assistance in some legal proceeding, so long as the communications were intended to be, and were in fact, kept confidential. <u>See United States v. Int'l Bhd. of Teamsters</u>, 119 F.3d 210, 214 (2d Cir. 1997); <u>United States v. Doe (In re Six Grand Jury Witnesses)</u>, 979 F.2d 939, 943 (2d Cir. 1992); <u>John Doe Corp. v. United States (In re John Doe Corp.)</u>, 675 F.2d 482, 487-88 (2d Cir. 1982); <u>Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.</u>, 160 F.R.D. 437, 441 (S.D.N.Y. 1995) (citing <u>United States v. United Shoe Mach. Corp.</u>, 89 F. Supp. 357, 358-59 (D. Mass. 1950)). The privilege is among the oldest of the common law privileges and "exists for the purpose of encouraging full and truthful

communication between an attorney and his client." <u>In re von Bulow</u>, 828 F.2d 94, 100 (2d Cir. 1987); <u>accord</u> <u>United States v. Bilzerian</u>, 926 F.2d 1285, 1292 (2d Cir. 1991). However, because the privilege "stands as an obstacle of sorts to the search for truth," it must be applied "only to the extent necessary to achieve its underlying goals." <u>XYZ Corp. v. United States (In re Keeper of the Records)</u>, 348 F.3d 16, 22 (1st Cir. 2003); <u>see also</u> <u>Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P. (In re Steinhardt Partners)</u>, 9 F.3d 230, 235 (2d Cir. 1993) (finding that the privilege does not apply in situations where the client's conduct does not serve to "improve[] the attorney-client relationship") (quoting <u>Permian Corp. v. United States</u>, 665 F.2d 1214, 1221 (D.C. Cir. 1981)). "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." <u>United States v. Doe (In re Grand Jury Proceedings)</u>, 219 F.3d 175, 182 (2d Cir. 2000) (quoting <u>Int'l Bhd. of Teamsters</u>, 119 F.3d at 214). Where a communication between client and attorney does not reveal any confidential matters, the communication is not privileged. For example, where the attorney or client is merely conveying the substance of what a third party has conveyed, the communication is not privileged. <u>See</u> <u>TVT Records, Inc. v. Island Def Jam Music Group</u>, No. 02 Civ. 6644 (VM)(DF), 2003 WL 749801, at *2 (S.D.N.Y. Mar. 5, 2003) (citing cases). Moreover, "[t]he privilege does not protect the client's knowledge of relevant

5

facts, whether or not they were learned from his counsel, or facts learned by the attorney from independent sources." Baptiste v. Cushman & Wakefield, Inc., No. 03 Civ. 2102 (RCC)(THK), 2004 WL 330235, at *1 (S.D.N.Y. Feb. 20, 2004).

The attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship. See In re Grand Jury Proceedings, No. M-11-189 (LAP), 2001 WL 1167497, at *7 (S.D.N.Y. Oct. 3, 2001); In re Kidder Peabody Sec. Litig., 168 F.R.D. 459, 468 (S.D.N.Y. 1996). A party who seeks to uphold the privilege must take affirmative measures to maintain the confidentiality of attorney-client communications. See In re Steinhardt Partners, 9 F.3d at 235; In re von Bulow, 828 F.2d at 100; In re Horowitz, 482 F.2d 72, 82 (2d Cir. 1973). Furthermore, a party cannot waive the privilege selectively; voluntary disclosure in one case waives the privilege with respect to the disclosed communication in all subsequent cases. See In re Steinhardt Partners, 9 F.3d at 235; Bowne of N.Y. City, Inc. v. AmBase Corp., 150 F.R.D. 465, 478-80 (S.D.N.Y. 1993).

## II. Communications with Agents of a Party

Defendants argue that many of the communications were not between client and attorney. For example, two of the parties to the communications were Kenneth M. Siskind and Stanley Schuman, who

were employed by Allen & Co., an investor in, and financial advisor to, UBO.  Allen & Co. also served as the private placement agent for the Series D financing which corresponded to the stock purchase agreement being negotiated between UBO and Defendants. (See Deposition of Kenneth M. Siskind, dated Nov. 15, 2005 ("Siskind Dep."), attached as Ex. 7 to Mitchell Ltr., at 24.)  UBO had a written agreement with Allen & Co., retaining it as its financial advisor to review its strategic plans and business alternatives, and  to advise the company with respect to financing alternatives, joint ventures, and strategic alliances.  The agreement required Allen & Co. to execute  a confidentiality agreement. (See Kidron Decl. ¶ 6 & Ex. B.)

Another party to the communications was Lizbeth Barron.  Ms. Barron worked at Bear Stearns, but she was an investor in UBO and, on a personal basis, acted as an agent for UBO in its search for potential investors.  By written agreement, in consideration for her services to UBO, UBO agreed to convey UBO stock to Barron. When she found potential investors, she put them in touch with Allen & Co. for more detailed information on UBO and its stock offering. (See Deposition of Lizbeth Barron, dated Dec. 2, 2005 ("Barron Dep."), attached as Ex. 8 to Mitchell Ltr., at 37, 58, 81.)  Ms. Barron appears to have introduced the Defendants to UBO and to have participated in some conversations with Defendants and UBO about the proposed stock offering.  For the most part, she had

little recollection of those conversations, and did not recall speaking to any of UBO's attorneys. (See id. at 124-27.)

"[C]ommunications which reflect advice given by counsel to a corporation do not lose their privileged status when they are shared among corporate employees who share responsibility for the subject matter of the communication." Baptiste, 2004 WL 330235, at *2. Similarly, an agent, such as a financial advisor, may have communications with an attorney that "are covered by the attorney-client privilege if the financial advisor's role is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer." Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd., 232 F.R.D. 103, 113 (S.D.N.Y. 2005) (citing United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961)); accord United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999)("[T]he inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client."); United States v. Adlman, 68 F.3d 1495, 1499 (2d Cir. 1995) ("Under certain circumstances, however, the privilege for communications with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client."). However, where the advice being sought is financial or otherwise non-legal, or it is the agent's advice

8

rather than the attorney's which is being sought, no privilege exists. See id. at 1499-1500 (quoting Kovel, 296 F.2d at 922).

Plaintiffs contend that the Allen & Co. employees, Siskind and Schuman, assisted in the transaction with Defendants and coordinated "with UBO's counsel as well as provid[ed] UBO's counsel with information that would allow counsel to provide advice to UBO on how to legally structure a deal." (Kidron Decl. ¶ 6.) The same is argued with respect to Barron.

The Court cannot determine in the aggregate whether the communications these consultants had with UBO and its attorneys were made in order to facilitate the attorneys' communications with, and provision of legal advice to, UBO. It is clear that some of these individuals were deeply involved in negotiating the transaction on behalf of UBO. Allen & Co. was retained as the company's financial advisor. However, simply because financial consultants are employed to assist a company in a restructuring transaction does not mean that their communications with the company's attorneys are privileged. What is relevant is whether their communications with the attorneys were made in confidence for the purpose of the client obtaining legal advice from its counsel, i.e., "to help [the attorney] reach the understanding he needed to furnish legal advice." Adlman, 68 F.3d at 1500 (where company acted as a tax and business advisor to client, and did not merely serve as an accountant assisting the attorney in rendering legal advice,

communications were not privileged); compare Ackert, 169 F.3d at 139-40 (where attorney communicated with outside investment banker in order for the attorney to understand the tax consequences of a transaction, rather than to improve communications with client, there was no privilege); Export-Import Bank, 232 F.R.D. at 112-14 (attorney communications with financial advisor and consulting firm were not privileged where the advisor helped lead a company through a debt restructuring, negotiated on behalf of client, and helped formulate financial strategies, the advisor's role was not limited to helping the lawyer give effective advice by explaining financial concepts); with Calvin Klein Trademark Trust v. Wachner, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000) (where client sought advice from investment banker which made it possible for attorney to render legal advice, communications were privileged).

III. Business Advice

        Defendants also contend that, from what they can glean from the privilege log about the documents in issue, many appear to relate to business, as opposed to legal, matters and advice.

        It is well-established that the attorney-client privilege applies only where legal advice, not business advice, is sought and given. See In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1037 (2d Cir. 1984); Colton v. United States, 306 F.2d 633, 638 (2d Cir. 1962) (investment advice given by an attorney is not privileged); Softview Computer Prods. Corp. v.

Haworth, Inc., No. 97 Civ. 8815 (KMW)(HBP), 2000 WL 351411, at *18 (S.D.N.Y. Mar. 31, 2000); Stratagem Dev. Corp. v. Heron Int'l, N.V., 153 F.R.D. 535, 543 (S.D.N.Y. 1994) (where advice is primarily legal, as opposed to business in nature, the privilege attaches); United States v. IBM Corp., 66 F.R.D. 206, 210 (S.D.N.Y. 1974) (same). When information is conveyed to an attorney, the communication need not specifically ask for legal advice in order to maintain the document's privileged status, so long as the information is sent to counsel in order for counsel to provide legal advice. See In re Buspirone Antitrust Litig., 211 F.R.D. 249, 254 (S.D.N.Y. 2002); In re Pfizer Inc. Secs. Litig., No. 90 Civ. 1260 (SS)(NRB), 1993 WL 561125, at *6 (S.D.N.Y. Dec. 23, 1993) ("An implied request [for legal advice] exists when an employee sends information to corporate counsel in order to keep them apprised of ongoing business developments, with the expectation that the attorney will respond in the event the matter raises important legal issues."). Moreover, even where there is a business transaction which is being considered, such transactions might have legal consequences on which legal advice is needed. See TVT Records, 2003 WL 749801, at *6 (communications copied to counsel for the purpose of allowing counsel to respond to ongoing developments with legal advice are privileged); cf. In re Grand Jury Subpoenas, 731 F.2d at 1038 ("documents [which] memorialize client confidences obtained in the pursuit of legal advice

concerning the mechanics and consequences of alternative business strategies" are protected by the attorney-client privilege).

Nevertheless, merely because a document is sent to an attorney does not render it a privileged attorney-client communication. As the Second Circuit has observed:

> [T]he attorney-client privilege protects only those papers prepared by the client for the purpose of confidential communication to the attorney or by the attorney to record confidential communications. . . . Insofar as the papers include pre-existing documents and financial records not prepared . . . for the purpose of communicating with their lawyers in confidence, their contents have acquired no special protection from the simple fact of being turned over to an attorney.

Colton, 306 F.2d at 639; accord Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2001 WL 1356192, at *5 (S.D.N.Y. Nov. 2, 2001). A test commonly employed is "whether a document was prepared primarily to seek legal advice." IBM, 66 F.R.D. at 213; accord Rossi v. Blue Cross and Blue Shield, 73 N.Y.2d 588, 594, 542 N.Y.S.2d 508, 511 (1989) ("So long as the communication is primarily or predominantly of a legal character, the privilege is not lost merely by reason of the fact that it also refers to certain nonlegal matters."); cf. Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2001 WL 388044, at *1 (S.D.N.Y. Apr. 17, 2001)("defendants have the burden of showing that communications to and from [their attorney] were made solely for the purpose of the [defendants] seeking legal advice and its counsel rendering it, and not for the purpose of advancing a party's business ventures.")

(internal citation and quotation marks omitted) (quoting <u>In re John Doe Corp.</u>, 675 F.2d 482, 488 (2d Cir. 1982)).

It is far easier to state the principle than to apply it. Judge Edelstein of this Court observed:

> The question of whether a document was prepared primarily to seek legal advice must be resolved by examining the circumstances under which the document was prepared. If the document was prepared for the purposes of simultaneous review by legal and non-legal personnel, it cannot be said that the primary purpose of the document is to secure legal advice. Therefore, one of the critical elements of the attorney-client privilege is absent at the outset.

<u>Id.</u> This broad statement has, however, been refined by other courts, with whom this Court agrees. As my colleague, Judge Gorenstein noted:

> <u>IBM</u> does not stand for the proposition that the mere simultaneous review of a document seeking legal advice by non-legal personnel vitiates the privilege. Instead, <u>IBM</u> focuses on whether the document asks non-legal personnel to respond to some problem or issue raised within the document. Where non-legal personnel are asked to provide a response to a matter raised in a document, it cannot be said that the "primary" purpose of the document is to seek legal advice. This is because the response by non-legal personnel by definition cannot be "legal" and thus the purpose of the request cannot be primarily legal in nature.

<u>Buspirone</u>, 211 F.R.D. at 253.

Where there are several possible interpretations of a document based upon the surrounding circumstances, the party asserting the privilege must produce evidence sufficient to satisfy a court that legal, not business, advice is being sought. <u>See</u> <u>Lyondell-Citgo Refining, LP v. Petroleos De Venezuela, S.A.</u>, No. 02 Civ. 0795

(CBM), 2004 WL 3019767, at *2 (S.D.N.Y. Dec. 29, 2004).

With these principles in mind, the Court turns to the specific documents in issue.

IV. <u>Documents' Privileged Status</u>

Virtually all of the documents on the privilege log contain communications about the stock purchase agreement that was being negotiated with Defendants. This was obviously a business transaction and, as is true of most business transactions, there were legal ramifications to the transaction which required the advice of attorneys. Nevertheless, not every communication to or from the attorneys, or copied to the attorneys, involved legal advice. Plaintiffs have overreached in their assertion of privilege.

Document #3 is an e-mail seeking information from UBO's agents and advisors in order to recreate the course of events involving Defendants that led up to the failed transaction. The e-mail was copied to Plaintiffs' counsel and was intended to gather information for counsel's use in this litigation. The attorney-client privilege and work product doctrine have been properly invoked. <u>See</u> Fed. R. Civ. P. 26(b)(3) (documents prepared "in anticipation of litigation" fall within the work product doctrine); <u>Hickman v. Taylor</u>, 329 U.S. 495, 511-12, 67 S. Ct. 385, 393-94 (1947) (explaining the scope of the work product doctrine); <u>United States v. Adlman</u>, 134 F.3d 1194, 1202 (2d Cir. 1998) (focusing on

whether the document was "prepared or obtained because of the prospect of litigation").

Document #16 is an e-mail exchange between UBO's outside counsel and its financial advisor (Siskind), in which they discuss matters concerning the Capitalization Table which was supposed to be an exhibit to the stock purchase agreement being negotiated with Defendants. A good number of the other withheld documents similarly discuss the Capitalization Table. These documents present the question of whether an attorney's suggestions regarding a capitalization table constitute legal advice or financial/business advice. The contents of the Capitalization Table are financial, and business people and investment bankers often create such tables. Indeed, it appears that the Capitalization Table at issue was initially created by Siskind, the financial advisor. While it is possible that a misstatement on the Capitalization Table could have legal ramifications, in making corrections to a table indicating outstanding blocks of stock and stock options, the attorney's advice does not "rest[] 'predominantly' on his assessment of the requirements imposed, or the opportunities offered, by applicable rules of law." Ross, 2004 WL 67221, at *3 (quoting Rossi, 73 N.Y.2d at 594, 542 N.Y.S.2d at 511). To all appearances, counsel was making the same sort of suggestions that the financial advisor was making. Accordingly, the communication does not fall within the attorney-client

privilege.

Document #30 is a letter from UBO's counsel to UBO's financial advisor (Siskind), itemizing a list of documents counsel was forwarding to Siskind in connection with Defendants' due diligence requests.  None of the documents identified in the letter are privileged, and counsel was neither asked for nor is imparting any confidential legal advice.  In fact, it can be assumed that the documents identified in counsel's letter were actually transmitted to Defendants.  The letter does not contain privileged material and should be produced.

Document #37 is an e-mail from Siskind reflecting changes he made to the Capitalization Table at the request of UBO's counsel. The e-mail was sent to business people and the attorneys.  Again, this involves primarily financial information, not legal advice. Accordingly, the communication does not fall within the attorney-client privilege.

Document #38 is an e-mail from Siskind, the financial advisor, to UBO's counsel, and provides the financial advisor's instructions with regard to factual information to be placed in the stock purchase agreement.  There is nothing in the communication which either explicitly or implicitly seeks legal advice, nor is it conceivable that legal advice could be given on such mundane matters as who the contact persons were at Goldman Sachs and Time Warner, as well as their addresses and telephone numbers.  This is

not a confidential attorney-client communication which is protected by privilege.

Document #52 is a communication between UBO's counsel and Siskind, in which counsel provided advice and comments on a Disclosure Schedule created in response to Defendants' due diligence investigation. The communication appears to provide the benefit of legal insight and advice and falls within the attorney-client privilege.

Document #53 is similar in content to Document #52 and properly falls within the attorney-client privilege.

Document #54 is similar to the previous two documents and is a privileged communication.

Document #55 is an e-mail from an attorney to Siskind, suggesting a minor revision to the Capitalization Table and forwarding drafts of the Disclosure Schedule and Capitalization Table. The e-mail itself, as others, does not contain legal advice, and the Draft Capitalization Table does not involve legal matters. The Draft Disclosure Schedule, which appears to have been drafted by attorneys, does involve legal matters such as ongoing litigation and proprietary rights in trademarks and leaseholds. Its completeness and accuracy clearly had legal implications with which attorneys would be concerned. Accordingly, Plaintiffs should produce the e-mail and Capitalization Table, and they may withhold production of the Draft Disclosure Schedule.

Although Document #56 is an e-mail from an attorney to Siskind, it contains no actual communication from the attorney, other than the attachment, which is a Draft Capitalization Table already determined to contain no legal advice. The only text, at the bottom of the e-mail, is identical to Document #37, which contains Siskind's communication regarding changes he made in the Capitalization Table. This does not represent a confidential communication for the purpose of obtaining legal advice. The document should be produced.

Document #57 is an e-mail from Siskind to a member of UBO's Board, forwarding the Capitalization Table and advising him that there would be a minor adjustment in the conversion feature of Bridge Notes to reflect the lower share price determined by the financial advisor as a result of changes in the Capitalization Table. The document merely reflects an adjustment in the financial structure of the stock purchase agreement, determined by the financial consultant, and does not convey legal advice. The document should be provided to Defendants.

Document #59 is an e-mail from an attorney to the financial advisor and client, advising them of the substance of a conversation the attorney had with Defendants' counsel. The document does not convey legal advice and should be produced. See, e.g., TVT Records, 2003 WL 749801, at *2 ("[Where, for example, an attorney is merely conveying to his client the substance of what a

18

third party has conveyed – - the Court has not accepted the asserted claims of privilege."); ECDC Envtl., L.C. v. N.Y. Marine and Gen. Ins. Co., No. 96 Civ. 6033 (BSJ)(HBP), 1998 WL 614478, at *9 (S.D.N.Y. June 4, 1998)("An attorney's communication to a client reporting facts learned by the attorney from a third party is not within the attorney-client privilege unless the information is included in legal analysis or advice communicated to the client.").

Document #61 is an e-mail from an attorney to UBO employees and board members, as well as the financial advisor, conveying the substance of an conversation the attorney had with Defendants' counsel. The document merely conveys the adversary counsel's comments. It does not contain legal advice and should be produced.

Document #63 is merely a cover e-mail conveying a draft letter that the attorney is proposing to send to adversary counsel. The draft letter is not included. The cover e-mail contains no substantive information and should be produced.

Document #64 consists of a series of e-mails between Adam Kidron, UBO's CEO, and various financial advisors. Only one of the e-mails is copied to an attorney. The initial e-mail merely conveys, to the financial advisors and a member of the board, the substance of a conversation Kidron had with his attorney, in which the attorney informed him of his conversation with Defendants' attorney and the transaction terms which Defendants would agree upon. The remainder of the e-mails in this series consist of the

19

financial advisor's statement of the impact of those terms on company capitalization, and of the advisor and Kidron having an exchange about the financial impact of the recapitalization on Kidron personally. These communications all relate to business and financial aspects of the transaction, and the Court perceives no request for legal advice in the communications. The document is not privileged and should be produced.

Document #65 is an exchange between Kidron, the CEO, and the financial advisor, with copies to various individuals including an attorney, in which the financial advisor submits another draft of the Capitalization Table, asking whether Kidron agrees with the calculations. Kidron briefly responds with his opinion about distributing stock options to employees to help build morale. These communications deal with business and financial matters. They do not contain a request for legal advice and no legal advice is given. The document is not protected by the attorney-client privilege.

Document #66 is a continuation of the communications in #65. The only addition is that a UBO board member responds to Kidron's suggestion of redistributing options to employees by simply agreeing. The recommendation and agreement involve a business decision, and there is no express or implied request for legal advice in the communications. The document should be produced to Defendants.

Document #67 is essentially the same as Document #3. It too reflects a timeline of the negotiations with Defendants and requests additional detail. The information was sought by counsel in relation to the events leading up to the instant litigation. It falls within the work product doctrine and attorney-client privilege.

Document #68 reflects communications among the financial advisors, UBO board members, and attorneys, regarding a draft of the term sheet outlining the proposed stock purchase agreement with Defendants. The parties comments are being shared with counsel, and it is clear that the advice and suggestions of counsel are being sought. The document is subject to the attorney-client privilege.

Document #69 is a communication from the financial advisor to UBO's counsel, providing minutes of a UBO meeting and asking counsel to redraft the minutes in legal form. There is nothing in the communication that suggests a request for legal advice, and the information being conveyed to counsel is merely a skeletal outline of the matters addressed at the board meeting, none of which appear to have required counsel's input. The document is not protected by the attorney-client privilege.

Document #70 is an e-mail from an attorney apprising the client of the substance of a conversation the attorney had with Defendants' counsel. The e-mail merely relates Defendants'

position with respect to the term sheet, and does not contain any legal advice.  It follows that this e-mail is not protected by the attorney-client privilege.

Document #71 is an e-mail from a UBO board member to the UBO CEO and the consultant, conveying an update from UBO's counsel regarding the negotiation of the term sheet with Defendants.  The e-mail contains virtually no substantive information, and clearly does not contain legal advice.  It refers in only general terms to developing a strategy for the negotiation of the term sheet.  Even if the e-mail did contain substantive information on that strategy, simply because an attorney participates in the negotiation of a business deal does not, by itself, render his communications on business strategy privileged.  The document should be produced.

Document #72 is an e-mail to UBO's counsel, with copies to business people, from a UBO board member.  The e-mail conveys the board member's view about a provision of the term sheet being requested by Defendants, and the logistical difficulties he thinks it would present.  There is no suggestion that any advice is being sought, and if such a request is implied, it appears that the advice would be of a business rather than legal nature.  The document is not protected by the attorney-client privilege.

Document #75 is an e-mail from UBO's counsel conveying the substance of a conversation he had with Defendants' counsel.  No legal advice is being conveyed, and, therefore, the document is not

protected by the attorney-client privilege.  Nor is the document protected as work-product, as claimed by Plaintiffs.  Simply because there is a slight suggestion in the communication that Defendants might be backing away from the deal, does not mean that the communication was prepared because of the prospect of litigation. <u>See</u> <u>Adlman</u>, 134 F.3d at 1202. The communication was made during the negotiations, and it is apparent that whatever the substance of the conversation had been, it would have been conveyed to the client to keep him informed of the progress, or lack thereof, of the negotiations.  The document should be produced.

Document #77 is an e-mail from one financial advisor to another financial advisor, which was forwarded on to the UBO attorney and CEO, in which the advisor appears to express a purely personal view as to who should sign a letter being addressed to Defendants, at a time when it appeared that Defendants were reneging on the deal.  The financial advisor was not the client, and there is no suggestion in the letter that legal advice was being sought.  Nor was the advisor's opinion necessary for an attorney to render any legal advice on the letter to the client. The document is therefore not covered by the attorney-client privilege.  Moreover, the financial consultant's suggestion as to who should sign a letter being sent to Defendants' counsel can hardly be considered work product. As Plaintiffs themselves argue, in disputing that a waiver of privilege has occurred by the

production of certain documents, a communication from a consultant setting forth strategies for dealing with Defendants' reneging on the deal, including the possibility of a lawsuit, is not privileged because it does not come from UBO's attorneys or touch on any legal advice or strategy of the attorneys. (See Wang Ltr., at 4-5.) The litigation options discussed in the document Bates Stamped AC0021, which was produced to Defendants, are far more explicit than those in the withheld document. Accordingly, the document should be produced.

Document # 82 is from UBO's CEO to his counsel and financial advisor, conveying information regarding working with UBO's litigation counsel in this action. The e-mail communicates the attorney's views about legal strategy and, therefore, was properly withheld under the attorney-client privilege and work product doctrine.

Document #84 is an e-mail from the financial advisor informing UBO's CEO about his conversation with UBO's counsel, and counsel's update regarding his failure to hear from Defendants about the term sheet. The document only discusses in very general terms how counsel or the financial advisor intends to communicate with Defendants. It does not convey any legal advice. The only substantive matter discussed is from the financial advisor to the CEO, relating to the seat the advisor's company had on the UBO board. Neither the advisor nor the CEO was acting in a legal

capacity, and the communication makes no reference to an attorney. Legal advice was neither being sought nor conveyed. The document is not a privileged communication.[2]

## CONCLUSION

For the reasons discussed above, Document Nos. 16, 30, 37, 38, 55 (portions discussed), 56, 57, 59, 61, 63, 64, 65, 66, 69, 70, 71, 72, 75, 77, and 84 were improperly withheld as privileged communications. They should be produced to Defendants.[3]

SO ORDERED.

_____
THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: April 18, 2006
      New York, New York

---

[2] The Court does not address Defendants' argument that Plaintiff has waived its privilege by producing similar documents containing discussions by the same parties about the same subjects. As Plaintiff correctly argues, the produced documents were not privileged; moreover, as the Court has found, the other withheld documents on the same subjects are also not privileged and will be produced.

[3] Because privilege was asserted with respect to deposition questions that addressed communications similar to the withheld documents, Defendants seek to continue various depositions so that they can repose the questions, and presumably question the witnesses about the withheld documents and the subjects they covered. While not precluding the reopening of depositions, the Court is doubtful that the depositions need to be reopened, since most of the documents which the Court has determined must be produced deal with matters that have little bearing on the outcome of this litigation, such as the Capitalization Table. Defendants should reconsider their position after they have reviewed the documents which must now be produced, and should first attempt to resolve this issue with Plaintiff.